UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
MEIR BABAEV and MICHAEL ARBIV               :
                                            :
               Plaintiffs,                  :     **MEMORANDUM & ORDER**
                                            :     03-CV-5076 (DLI) (WDW)
       -against-                            :
                                            :
RICHARD GROSSMAN, RICHARD                   :
STUART CATERERS, LTD. and                   :
RICHARD STUART KOSHER                       :
CATERERS, LTD.,                             :
                                            :
               Defendants.                  :
-----------------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

Plaintiffs, Meir Babaev and Michael Arbiv, bring this securities fraud action against two catering companies and their acting president and shareholder, respectively, Richard Stuart Kosher Caterers, Ltd. ("RSKC"), Richard Stuart Caterers, Ltd. ("RSC"), and Richard Grossman ("Grossman"). Plaintiffs allegedly relied on Grossman's material misrepresentations and omissions when investing in RSKC and RSC. Plaintiffs now move for partial summary judgment, pursuant to Fed. R. Civ. P. 56, on their claims under § 10(b) of the Securities Exchange Act of 1934 (the "Act") (15 U.S.C. 78j); Rule 10b-5 promulgated thereafter; and § 20(a) of the Act (15 U.S.C. § 78t). For the reasons set forth below, plaintiffs' partial motion for summary judgment is denied.

**Background**

In July 2001, Plaintiffs, proprietors of Wait 4 Me Corp ("Wait 4 Me"), a wait-staffing business, and Grossman began negotiations for the purchase and sale of partial interest in RSKC and RSC. (*See* Grossman Aff. ¶¶ 2, 3.) During these negotiations, Grossman allegedly made various misrepresentations to plaintiffs concerning an investment in RSKC and RSC. (*See* Compl. ¶¶ 6-7.) Specifically, plaintiffs allege that Grossman represented that RSKC and RSC were and would

continue to be a profitable enterprise or "cash cows" and that plaintiffs would derive substantial returns on an investment in RSKC and RSC because RSKC and RSC had exclusive catering arrangements with two temples, Temple Chaverim of Long Island, Inc. ("Temple Chaverim") and Merrick Jewish Centre ("MJC"). (*See* Defs.' 56.1 Statement ¶ 7; Grossman Aff. ¶¶ 3, 6; Pls.' 56.1 Statement ¶¶ 6, 7.)

On or about July 20, 2001, Grossman delivered to plaintiffs a memorandum entitled "General Terms For Share Purchase of RSKC" (the " Investment Agreement") that set forth the terms of plaintiffs' prospective investments in RSKC and RSC. (*See* Pls.' 56.1 Statement at ¶ 8; Defs.' 56.1 Statement at ¶ 8.) Shortly thereafter, plaintiffs agreed to purchase a ten percent interest in RSKC and RSC for a total of $175,000.00. (Pls.' 56.1 Statement at ¶ 9; Defs.' 56.1 Statement at ¶ 9; Am. Answer at ¶¶ 87-88.) On or about July 24, 2001, plaintiffs began making payments toward the purchase of common stock interest in RSKC and RSC.

In a letter dated July 18, 2001, counsel for MJC advised that RSKC had "breached and defaulted under the terms of a certain Exclusive Catering Licensing Agreement." ("MJC Catering Agreement") (*See* Pl's Mot. Ex. C at 1.) Specifically, MJC advised that RSKC failed to "report and/or pay for off-premises catered affairs for which RSKC provided the food, [] account to the MJC for kiddushes,[1] and adhere to and comply with the strict rules of Kashrut [2] . . . ." (*See* Pls.' Aff. Ex. D.)

---

[1] Kiddush is "a Jewish ceremony that proclaims the holiness of the incoming Sabbath or festival and that consists of a benediction pronounced customarily before the evening meal over a cup of wine or two loaves of white Sabbath bread." Webster's Third New International Dictionary 1241 (2002)

[2] Kashrut is the state of being kosher according to Jewish religious law or Jewish dietary laws. Webster's Third New International Dictionary 1233 (2002).

In addition, RSC allegedly breached its Operating Agreement dated June 16, 1999 with Temple Chaverim ("Temple Chaverim Agreement") by serving non-kosher foods. (*See* Pls.' Mot Ex. E.) Section 6.05 of the Temple Chaverim Agreement provided that "only kosher meats and poultry will be served." (Pls.' Mot. Ex. E at 11.) Section 10 of the agreement further provided that "[f]ailure of the [RSKC] to observe [MJC]'s rules set forth under or promulgated pursuant to paras. 6.05" constituted a material breach of the contract, giving MJC the right to terminate the Catering Agreement. (Pls.' Mot. Ex. E at 14.) Ultimately, in or about August 2003, Temple Chaverim terminated its agreement and business with RSC. (Am. Compl. at ¶ 57.)

The instant action was filed on October 7, 2003. In December 2003, plaintiffs filed an amended complaint alleging violations of § 10(b), Rule 10b-5, and § 20(a) of the Act. (Am. Compl. at ¶¶ 64-69.) Plaintiffs also allege common law fraud, negligent misrepresentation, and breach of contract claims. (Am. Compl. at ¶¶ 70-80.) Specifically, plaintiffs allege that Grossman made material misrepresentations and omissions as to the profitability of RSKC and RSC and failed to advise that defendants were in breach of their respective exclusive agreements with MJC and Temple Chaverim (the "Temples"). (Am. Compl. at ¶¶ 57-66.) Finally, plaintiffs allege that they relied on defendants' misrepresentations and omissions when investing in RSKC and RSC, and, but for such misrepresentation and omissions, plaintiffs would not have invested in RSKC and RSC. (Am. Compl. at ¶¶ 64-66.)

Plaintiffs now move for partial summary judgment on their § 10(b), Rule 10b-5 and § 20(a) claims. Defendants do not deny receipt of notice from the Temples that defendants were allegedly in breach of their respective catering agreements (hereinafter "Default Notices"). Instead, defendants contend that any failure to inform plaintiffs of the Default Notices was not a material

omission because RSKC and RSC never "prepared, stored or served non-kosher foods" in violation of the agreements. (*See* Grossman Aff. at ¶ 7.) Defendants further contend that "at no time prior to plaintiffs' investment in RSKC and RSC were defendants' contracts or catering licenses ever in jeopardy," and that "as of July 2001, RSC and RSKC each booked business in excess of $500,000.00." (*Id.*)

## Discussion

### I.     Summary Judgment Standard

Summary judgment will be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S. Ct. 2505; *accord Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir.1991).

"In considering a motion for summary judgment, the [] court may rely on any material that would be admissible or usable at trial." *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir. 1994). The court may not properly grant summary judgment where the issue turns on the credibility of witnesses. *Id.* Any assessments of credibility and all choices between available inferences are matters to be left for a jury, not matters to be decided by the court on summary judgment. *See* Fed.

R. Civ. P. 56(e), 1963 Advisory Committee's Note; *Azrielli*, 21 F.3d at 517.

## II. Section 10(b) & Rule 10b-5

To succeed on a claim under Section 10(b) of the Act (15 U.S.C. § 78j(b)), and Rule 10b-5 (17 C.F.R. § 240.10b-5), a plaintiff must establish that a defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiff's reliance was the proximate cause of their injury." *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 106 (2d Cir. 1998). A failure to disclose material information is actionable only when the defendant had an affirmative duty to disclose these facts. *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).

### A. Materiality

Materiality is typically a "mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts." *TSC Indus. v. Northway, Inc.*, 426 U.S. 429, 450, 96 S. Ct. 2126, 2133, 48 L. Ed. 2d 757 (1976). "In considering whether summary judgment is appropriate, [the court] must bear in mind that the underlying objective facts, [ ] are merely the starting point for the ultimate determination of materiality." *Id.* The determination requires delicate assessments of the inferences a "reasonable [investor]" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact. *Azrielli*, 21 F.3d at 518. Summary judgment should be granted only where the established omissions [and/or misrepresentations] are so obviously important to an investor, that reasonable minds cannot differ on the question of materiality. *TSC Indus.*, 426 U.S. at 450.

Information is material for purposes of § 10(b) of the Act, if there is a "substantial likelihood that a reasonable [investor] would consider it important in deciding whether to [invest]." *See Basic*

*Inc. v. Levinson*, 485 U.S. 224, 241, 108 S. Ct. 978, 988-89, 99 L. Ed. 2d 194 (1988); *TSC Indus.*, 426 U.S. at 449. The information must be "viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *See Caiola v. Citibank, N.A.*, 295 F.3d 312, 329 (2d Cir. 2002). Material facts may "include not only information disclosing the earnings and distributions of a company but also those facts [that] affect the probable future of the company and those [that] may affect the desire of investors to buy, sell, or hold the company's securities." *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 732 (2d Cir. 1987). "[W]hether facts are material within Rule 10b-5 when the facts relate to a particular event and are undisclosed by those persons who are knowledgeable thereof will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Id.* (citing to *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968), *cert. denied*, *Coates v. SEC*, 349 U.S. 976, 89 S. Ct. 1454, 22 L. Ed. 2d 1756 (1969).

Plaintiff alleges that defendants materially misrepresented that "RSC and RSKC were and would continue to be 'cash cows'" and would afford plaintiffs a substantial return on their investment "because of the existence of [RSKC and RSC's] long-term contracts" with the Temples. (Pls.' 56.1 Statement ¶ 7; Defs.' 56.1 Statement ¶ 7; *see also* Grossman Aff. ¶¶ 3, 6.) Specifically, plaintiffs contend that these statements were materially false because defendants failed to advise plaintiffs that defendants received the Default Notices from the Temples. In fact, defendants concede that they did not advise plaintiffs of such Default Notices, but contend that receipt of such notices were not material because defendants did not breach their agreements with the Temples. (*See* Grossman Aff. at ¶ 7.)

The Court finds that defendants' failure to notify plaintiffs of the Default Notices constitutes a material omission. A large portion of RSKC and RSC's business was derived from the exclusive agreements between defendants and the Temples and any potential termination of these exclusive agreements would affect the probable future of the company. *See In re Initial Public Offering Sec. Litig.*, 358 F. Supp. 2d 189 (S.D.N.Y. 2004) (holding that expiration of 75% of a corporation's advertising contracts in one month was a material fact); *Kronfeld*, 832 F.2d at 732 (finding that material facts include "facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities."). Certainly, such information would affect a reasonable investor's or plaintiffs' desire to invest in RSKC and RSC. *See Basic Inc.*, 485 U.S. at 241; *In re Initial Public Offering Sec. Litig.*, 358 F. Supp. 2d 189; *Kronfeld*, 832 F.2d at 732. As Judge Platt accurately stated in his April 6, 2004 Memorandum and Order denying defendant's motion to dismiss under Rule 12(b)(6):

> The materiality of this omission is obvious – not only were Defendants about to lose a main source of revenue, but they could also face prosecution under New York law. And this skeleton in defendants' closet made false their representations about the profitability of their business. Far from being a proverbial "cash cow"…Defendants' business perhaps more closely resembled a steer being led to slaughter.[3]

J. Platt Mem. and Order at 8 (Apr. 6, 2004).

In opposition, defendants contend that not advising plaintiffs of the Default Notices was not a material omission because defendants did not "ever [actually] breach their agreements with MJC or Temple Chaverim by servicing non-kosher meat in violation of those agreements." (Defs.' MOL

---

[3] Although the standard of review of a Rule 12 motion to dismiss is different from the standard of review for a motion for summary judgment, plaintiffs' allegation that defendants failed to advise plaintiffs that defendants received notice of an alleged breach of the Catering Agreement is supported by evidence submitted in this motion. In fact, defendants concede that they failed to advise plaintiffs of the Default Notices. (Grossman Aff. at ¶ 7.)

-7-

at 3.) However, the question of materiality is not whether the defendants in fact violated the agreements with the temples, but rather whether a reasonable investor would consider the receipt of such Default Notices important in deciding to invest. Here, the fact that defendants received the Default Notices is significant enough to alter the "total mix" of information available to plaintiffs in deciding whether to invest in RSKC and RSC. *See Caiola,* 295 F.3d at 329. Therefore, failing to advise plaintiffs of the Default Notices constitutes a material omission under § 10(b) and Rule 10b-5.

**B.     Scienter**

"The scienter needed in connection with securities fraud is intent 'to deceive, manipulate, or defraud,' or knowing misconduct." *Press v. Chemical Inv. Serv. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999) (quoting *S.E.C. v. First Jersey Sec. Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996)). "Scienter under § 10(b) or Rule 10b-5 may be established through showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents extreme departure from standards of ordinary care." *S.E.C. v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S. Ct. 1375, 1380-81, 47 L. Ed. 2d 668 (1976) (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 46 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S. Ct. 642, 58 L. Ed. 2d 698 (1978) (internal quotations omitted)).

Here, a genuine issue of fact exists as to whether Grossman acted with the requisite scienter in failing to disclose receipt of the Default Notices. Grossman states that "[w]hile [he] did express to plaintiffs [his] belief that RSC and RSKC were and would continue to be profitable enterprises, at the time that [he] made these representations, [he] believed them to be true." (Grossman Aff. at ¶ 3.) Grossman further stated that "although [he] did receive notice from MJC indicating that it

believed RSKC was in breach of its catering agreement with MJC, at no time prior to plaintiffs' investment in RSC or RSKC were defendants' contracts or catering licenses with either MJC or Temple Cheverim [sic] ever in jeopardy." (Grossman Aff. at ¶ 7.) Finally, Grossman states that "as of July 2001, RSC and RSKC each had booked business in excess of $500,000." (Grossman Aff. at ¶ 7.)

In support of their motion, plaintiffs rely heavily on the affidavit of Christopher Fiorello, defendants' former catering manager, who states that he attended various meetings where Grossman made various misrepresentations to plaintiffs. (Fiorello Aff. at ¶ 6.) However, Grossman indicates that "[w]hen [he] met with plaintiffs to discuss the possibility of their investments in RSC and RSKC, Christopher Fiorello was never present, and was never a party to [the] discussion or negotiations." (Grossman Aff. at ¶ 2.)

Fiorello also states that "[i]n or about July 2001, [he] observed that RSC was storing, within the freezer in the Cater's kitchen at the Chaverim catering facilities, non-kosher meat, which was intermingled with Kosher meats." (Fiorello Aff. at ¶ 9(b).) Plaintiffs submit various invoices from a meat distribution company where RSC ordered non-Kosher meats. (*See* Pls.' Reply Ex. 3.) However, all the invoices post-date the parties investment negotiations, which took place in July 2001. The earliest invoice is dated August 23, 2001. (*See* Pls.' Reply Ex. 3.) Nonetheless, such an invoice does not lead to the conclusion that RSC was serving non-kosher meats at Temple Chaverim. RSC could have had other clients that did not require kosher meats. However, no evidence is submitted to indicate whether or not RSC had such clients.

Fiorello further states that "[i]n or about mid to late September, 2001, [he] learned that RSKC had, for some time, been in violation of its exclusive catering agreement with the MJC, and

that MJC had issued numerous notices and demands in that connection, which substantially predated July, 2001." (Fiorello Aff at ¶ 9(c).) However, plaintiffs do not submit any evidence corroborating Fiorello's statements. MJC's default notice does not indicate any prior notices and demands, written or oral, given to defendants before the written default notice dated July 18, 2001. (*See* Pls.' Mot. Ex. E.) In fact, MJC's default notice indicates that, after a July 12, 2001 MJC executive committee meeting, MJC determined that RSKC was in breach of the catering agreement. (*See* Pls.' Mot. Ex. E.) This tends to show that MJC did not decide, let alone notify, defendants of their alleged breach of the catering agreement.

Grossman also indicates that as a result of Fiorello's termination on "non-amicable terms," Fiorello now does business with plaintiffs and has an "axe to grind" with defendants. The conflicting statements between Grossman and Fiorello, coupled with Fiorello's alleged bias raises the question of witness credibility, which should be left for a jury to decide. In addition, resolving all ambiguities and drawing all inferences against the plaintiffs, the moving party, there exists a dispute as to whether defendants acted with the requisite scienter.[4]

### C. Reliance

A § 10(b) action requires that the plaintiff "relied on the alleged misrepresentations and omissions." *Louros v. Kreicas*, 367 F. Supp. 2d 572, 590 (S.D.N.Y. 2005). Typically, the question of whether a plaintiff justifiably relied is a question of both fact and law. *Id*. Where a § 10(b) claim rests on an omission of material fact, as does plaintiffs' claim, a rebuttable presumption of reliance

---

[4] Although Judge Platt stated that "the inference of fraudulent intent, in the context of a securities offering, is clear," in deciding the motion to dismiss, all facts alleged in the complaint are assumed to be true. Whereas, here, all ambiguities and inferences must be drawn in favor of the defendants. (*See* J. Platt Mem. and Order at 8.)

arises. *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 152-54, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972); *Press*, 166 F.3d at 539. In the case of a failure to disclose, the plaintiff need not proffer positive proof of his reliance as a prerequisite to recovery. *Affiliated Ute Citizens,* 406 U.S. at 153. The plaintiff must only show that the omission would be material "in the sense that a reasonable investor might have considered them important in the making of this decision." *Id*. at 153-54; *see also Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 384, 90 S. Ct. 616, 621, 24 L. Ed. 2d 593 (1970); *Texas Gulf Sulphur*, 401 F.2d at 849.

Here, the Court has found that defendants' failure to advise plaintiffs of the Default Notices constitutes a material omission, giving rise to the rebuttable presumption of justified reliance. *Affiliated Ute Citizens*, 406 U.S. at 152-54; *Press*, 166 F.3d at 539. Defendants contend that plaintiffs failed to exercise reasonable diligence prior to investing in RSKC and RSC and, thus, could not reasonably have relied on the defendants' omission. (*See* Defs.' MOL at 7.) The Second Circuit has held that "[a]n investor may not justifiably rely on a misrepresentation [or omission] if, through minimal diligence, the investor should have discovered the truth." *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993). Section 10(b) liability will not be imposed when an investor's conduct rises to the level of recklessness. *Royal Am. Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1015-16 (2d Cir. 1989). In determining whether an investor acted recklessly and did not justifiably rely on an omission, no single factor is dispositive, and all relevant factors must be considered and balanced. *Brown*, 991 F.2d at 1032. The courts have considered the following relevant factors: "(1) [t]he sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of longstanding business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the

fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations." *Id.* (citing *Davidson v. Wilson*, 973 F.2d 1391, 1400 (8th Cir. 1992)); *Myers v. Finkle*, 950 F.2d 165, 167 (4th Cir. 1991); *Molecular Tech. Corp. v. Valentine*, 925 F.2d 910, 918 (6th Cir. 1991); *Bruschi v. Brown*, 876 F.2d at 1529 (11th Cir. 1989); *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 804 (1st Cir. 1987); *Zobrist v. Coal-X, Inc.*, 708 F.2d at 1516 (10th Cir. 1983)).

Defendants contend that plaintiffs are sophisticated business persons, engaging in an arm's length transaction for the purchase of stock and that plaintiffs recklessly entered into the investment without first inspecting RSKC and RSC's corporate books. (Defs.' MOL at 7-8.) Although plaintiffs are sophisticated business persons in the catering or wait-service industry, there is no indication that they are sophisticated and possess expertise in finance or investment matters. Moreover, the parties did not have a long business relationship, but rather defendants were introduced by Fiorello to plaintiffs in June 2001, one month prior to the investment deal. (Fiorello Aff. at. ¶ 5.) Although the plaintiffs allegedly did not inspect RSKC and RSC's corporate books, it is not certain that an inspection of RSKC and RSC's books would have revealed the Default Notices or any financial instability of RSKC or RSC, particularly in light of the close temporal proximity between the investment negotiations and defendants' receipt of such Default Notices, all of which occurred in or around July 2001. It is unclear when defendants received the default notice. It is unclear when the parties closed the investment deal. Moreover, Temple Chavarim did not cease its business with RSC until August 2003, two years after the default notice, thus, a search of defendants' corporate books may not have revealed any financial instability on the part of RSKC and RSC. Although smart investors might have contacted the Temples to verify the validity,

exclusivity, and profitability of the catering contracts immediately prior to closing on the investment deal, whether plaintiffs' failure to do so rises to the level of recklessness remains a genuine issue of material fact for the jury. Therefore, a genuine issue of material fact exists as to whether plaintiffs could have uncovered the omission with minimal diligence or were otherwise reckless in failing to do so, thereby rebutting the presumption that plaintiffs justifiably relied on defendant's material omissions.

## III.     Control Person Liability

Section 20(a) provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t. To establish liability under § 20(a), a "plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (citing *First Jersey Sec.*, 101 F.3d at 1472-73 (internal quotation marks omitted)).

Under § 20 of the Act, 15 U.S.C. § 78t, individual corporate officials can be held liable for the fraudulent acts of their respective companies if they were in a controlling position. An implicit prerequisite to individual liability, however, is primary liability. *See Brown v. Hutton Group*, 795 F.Supp. 1317, 1324-25 (S.D.N.Y. 1992) ("[I]t is impossible to state a claim for secondary liability under § 20 without first stating a claim for some primary violation of the security laws on the part

of the controlled party."); *see also Ferber v. Travelers Corp.*, 785 F.Supp. 1101, 1111 (D.Conn. 1991) ("claims for secondary liability must be dismissed when primary violation claims are dismissed"); *Goodman v. Shearson Lehman Bros., Inc.*, 698 F.Supp. 1078, 1086 (S.D.N.Y.1988) (holding that the plaintiff could not maintain controlling person liability against individuals after the court had dismissed the claims against the controlled company).

Here, the Court does not find that plaintiffs are entitled to summary judgment on their securities fraud claim. Therefore, the court cannot find control person liability on the part of Grossman.

## **Conclusion**

Accordingly, plaintiffs' partial motion for summary judgment on their claims under § 10(b) of the Act; Rule 10b-5 promulgated thereafter; and § 20(a) of the Act is denied.

SO ORDERED.

DATED:     Brooklyn, New York
               February 26, 2007

_____/s/_____
DORA L. IRIZARRY
United States District Judge